Hon. Nicholas A. Robinson Deputy Commissioner New York State Department of Environmental Conservation
You have asked whether revenues from the "Gift to Wildlife" program, must be used only for species defined as "fish, game and shellfish" and to benefit persons engaged in fishing and shooting, or whether the funds may be used to support a broad range of fish and wildlife management activities.
Section 625 of the Tax Law established the "Gift for fish and wildlife management" which allows individuals,
 "to contribute to the conservation fund for fish and wildlife purposes * * * Notwithstanding any other provision of law all revenues collected pursuant to this section shall be credited to the conservation fund and used only for those purposes enumerated in section eighty-three of the state finance law" (Tax Law, § 625; emphasis supplied).
Section 83 of the State Finance Law entitled "Conservation Fund" describes the source of the fund and the purposes for which the fund may be used:
 "The conservation fund shall consist of all moneys belonging to the state received by the department of environmental conservation from the sale of licenses for hunting, for trapping, and for fishing, all moneys received in actions for penalties under articles eleven and thirteen of the environmental conservation law and subdivision two of section 71-1929
of the environmental conservation law, or upon the settlement or compromise thereof, all fines for violation of any of the provisions of articles eleven and thirteen of the environmental conservation law, all moneys arising out of the operation of real property under the jurisdiction of the division of fish and wildlife in the department of environmental conservation heretofore or hereafter acquired by the state of New York, and from any concessions thereon and from any leases thereof, including moneys received from the sale thereof when authorized by law, all moneys received from leases or rentals of shellfish grounds in the marine and coastal district, all moneys from gifts for fish and wildlife management pursuant to section six hundred twenty-five of the tax law, and all other moneys arising out of the application of any provisions of articles eleven and thirteen of the environmental conservation law. These moneys, after appropriation by the legislature, and within the amounts set forth and for the several purposes specified, shall be available to the department of environmental conservation for the care, management, protection and enlargement of the fish, game and shellfish resources of the state and for the promotion of public fishing and shooting. In the accomplishment of these objects the moneys made available hereunder shall be devoted to the purchase or acquisition of lands, lands under water, waters, or rights therein as required, to payment for personal service, for maintenance and operation, and for new construction and permanent betterments, and to all other proper expenses of the department of environmental conservation in the administration and enforcement of the provisions of articles eleven and thirteen of the environmental conservation law" (State Finance Law, § 83[a][1]; emphasis supplied).
In order to answer the question raised, it is helpful to look at the statutory history of section 83 of the State Finance Law. Its predecessor, which established the conservation fund, was section 104 (L 1925, ch 592), which provided as follows:
 "The conservation fund shall consist of one-half of all moneys belonging to the state received by the conservation commission from the sale of licenses for hunting, for trapping, and for fishing. These moneys shall, after appropriation by the legislature, be applicable only to establishment and maintenance of a statewide system of fish and game refuges, to promotion of public fishing and shooting, and to demonstration of forest management. In the accomplishment of these objects the moneys available hereunder shall be devoted to the purchase or acquisition of lands, lands under water, waters, or rights therein, as required; and may also be devoted to the establishment of game farms for propagating guadrupeds and game birds to restock the covers in this state; to the erection of such dams and buildings as may be required; to securing quadrupeds, birds and eggs and providing for their distribution; to making biological surveys of waters and lands for the purpose of determining the most practical methods of increasing fish and game production; to the purchase of such equipment and supplies as may be required; and to the employment of such biologists, game keepers and other assistants as may be deemed necessary at such compensation as the commission may determine; or to the defraying of any other expenses of the conservation commission. Such lands and property rights may be acquired by the conservation commission by gift or purchase, by condemnation in the manner provided in the condemnation law, and amendments thereto, or by appropriation thereof in the manner provided by section fifty-nine of the conservation law for the appropriation of certain park lands" (L 1925, ch 592).
Thus, as originally constituted, the conservation fund focused on promotion of fishing and hunting and the source of funds for these programs was the license fees paid for hunting, trapping and fishing.
In 1933 (ch 222), section 104 of the State Finance Law was amended to expand the sources of money for the conservation fund. Also, the language describing permissible uses of the fund was amended and for the first time incorporated provisions of the Conservation Law (then Art 4), the predecessor of the Environmental Conservation Law (ECL)
 "the conservation fund shall consist of all moneys belonging to the state received by the conservation department from the sale of licenses for hunting, for trapping, and for fishing, all moneys received in actions for penalties under article four of the conservation law, or upon the settlement or compromise thereof, all fines for violations of any of the provisions of article four of the conservation law, all moneys arising out of the operation of game farms, fish hatcheries and rearing stations heretofore or hereafter acquired by the state of New York, and from any concessions thereon and from any leases thereof, including moneys received from the sale thereof when authorized by law, all moneys received from leases or rentals of shellfish grounds in the marine district, and all other moneys arising out of the application of any provisions of article four of the conservation law. These moneys, after appropriation by the legislature, and within the amounts set forth and for the several purposes specified, shall be available to the conservation department for the care, management, protection and enlargement of the fish and game resources of the state and for the promotion of public fishing and shooting. In the accomplishment of these objects, the moneys made available hereunder shall be devoted to the purchase or acquisition of lands, lands under water, waters, or rights therein as required, to payment for personal service, for maintenance and operation, and for new construction and permanent betterments, and to all other proper expenses of the conservation department in the administration and enforcement of the provisions of article four of the conservation law. * * *"
In 1940 (L 1940, ch 593), the State Finance Law was reconstituted and the content of section 104 was transferred to section 83. The language of former section 104 was continued in section 83 including the reference to Article 4 of the Conservation Law. The language of current section 83 is substantially the same as in 1933 and 1940, except that the reference to Article 4 has been replaced by a reference to Articles 11 and 13 of the ECL. The major changes in this provision occurring in 1933, and continued thereafter, is an expansion in the sources of funding and the addition of the reference to the ECL.
Beginning in 1933 with the first reference in the conservation fund provisions to Article 4 of the Conservation Law and continuing with later references to Articles 11 and 13 of the ECL, the authorized activities of the Department under these provisions dealt increasingly with a broad range of wildlife activities and did not deal exclusively with fishing and hunting.
The Conservation Law preceded the Environmental Conservation Law, and Article 4 of the former was the Fish and Game Law. Article 4 traces its roots to Laws of 1912, chapter 318, when it was then Article 5. Extensive amendments occurred in 1928 (ch 242; when it was renumbered Art 4), in 1938 (ch 40) and in 1955 (ch 630).
In 1933 and 1940, Article 4 of the Conservation Law dealt primarily with the regulation of fishing and hunting, but was not limited to those subjects. In 1933, the Department was permitted to issue licenses to people seeking to possess fish, acquatic animals, quadrupeds, birds, birds' nests or eggs for propagation, scientific or exhibition purposes (added by L 1928, ch 242, § 158[1]). This power was later enlarged with the addition of a new provision to protect these species from cruelty.
 "The department shall have power to make regulations governing the possession of such fish, acquatic animals, quadrupeds or birds to protect them from cruelty, disease or undue discomfort and to protect the public from attack or contamination" (L 1938, ch 40, § 154[3]; emphasis supplied).
It is clear that this provision was not intended solely to serve the interests of those engaging in fishing and hunting.
A second example of the broader interests encompassed by Article 4 of the Conservation Law involves pollution. In 1933, section 248 (L 1928, ch 242) prohibited the pollution of waters used by State fish hatcheries. In 1938, the list of pollutants and prohibited acts was markedly increased, and no longer was the prohibition limited to waters used by State fish hatcheries. Section 213 of the 1938 version of the Fish and Game Law prohibited the polluting or obstructing of any stream (L 1938, ch 40).
There are other examples of activities by the Department under the 1938 Conservation Law which indicate a broadened focus. Under section 174 of the Conservation Law, a permit was required for persons to transport into the State from without the State any live wild bird or quadruped. The Department was authorized to set aside land and water as a refuge for the protection of fish, birds, quadrupeds, trees and plants (id., § 362).
These examples are offered to indicate that in 1933 and 1940, at the time section 104 and subsequently section 83 of the State Finance Law made reference to proper expenses of the Department under Article 4 of the Conservation Law, Article 4 had already developed a focus broader than merely promoting the interests of fishing and hunting.
Reviewing Article 4 as amended in 1955, one sees that this trend of broadening the interests served by the Conservation Law continued. Section 166 of the 1955 version of Article 4 states the general powers and duties of the Department. One such power demonstrates this broader focus:
 "To enforce all provisions of the Fish and Game Law and regulations pursuant thereto, and all laws relating to fish, wildlife, protected insects, shellfish, crustacea and game" (§ 166[10]; L 1955, ch 630).
Wildlife was defined to include wild game and all other vertebrate animal life existing in a wild state, except fish, shellfish and crustacea (§ 154[6][a]). It is readily apparent that the subject of protection was not limited to fish and game.
Another example of the comprehensive objective of Article 4 is found in section 175(1) which dealt with "the efficient management of the fish and wildlife resources of the state" (added by L 1957, ch 1016). The resources to be managed under this provision included all animal and vegetable life and the soil, water and atmospheric environment to the extent that they constituted the habitat of fish and wildlife. The Department was directed to maintain and improve these resources as natural resources and to develop and administer measures for making them accessible to the people of the State. Under section 200 of the 1955 Conservation Law, the Department was authorized to issue permits enabling persons to take wildlife should it become a nuisance or if it destroys public or private property or poses a threat to public health and welfare. The Department was also authorized to enter into cooperative agreements with the United States government, a municipality or person to promote fish and wildlife practices (Conservation Law [1955], § 360 [1][d]).
It was in 1969 that the Division of Fish and Game became the Division of Fish and Wildlife (L 1969, ch 652). The stated purpose of the bill to amend the title of the Division of Fish and Game was:
 "to reflect more realistically its present scope of responsibility * * * With respect to terrestrial species the scope of the responsibilities and functions of this division has been increasingly extended to include all wildlife, not just game birds and animals. This is reflected not only in its program but also in the law that governs its activities." May 9, 1969, memorandum on Assembly Int. 5248-A from R. Stewart Kilborne, Conservation Commissioner.
Thus, the legislative intent was to reflect that programs being conducted by the Conservation Department had become more expansive.
Article 4 of the Conservation Law was repealed in 1972 (L 1972, ch 664) and the subject matter was reenacted under Articles 11 and 13 of the Environmental Conservation Law. Article 11 is the fish and wildlife portion of the Environmental Conservation Law while Article 13 of that Law refers to marine and coastal resources. Together Articles 11 and 13 comprise the Fish and Wildlife Law (Environmental Conservation Law, § 11-0101).
It was in 1982 that the portion of section 83 referring to Article 4 of the Conservation Law was amended to refer instead to the ECL (L 1982, ch 4). Section 83(a)(1) directs that the conservation fund be devoted to all proper expenses of the Department in the "administration and enforcement of the provisions of articles eleven and thirteen of the environmental conservation law".
The Environmental Conservation Law states the policies and purposes underlying the powers granted to the DEC under the Fish and Wildlife Law.
 "The efficient management of the fish and wildlife resources of the state. Such resources shall be deemed to include all animal and vegetable life and the soil, water and atmospheric environment thereof, owned by the state or of which it may obtain management, to the extent that they constitute the habitat of fish and wildlife as defined in section 11-0103. Such management shall be deemed to include both the maintenance and improvement of such resources as natural resources and the development and administration of measures for making them accessible to the people of the state" (ECL, § 11-0303; emphasis supplied).
Wildlife is defined by the ECL as "* * * wild game and all other animallife existing in a wild state, except fish, shellfish and crustacea" (§ 11-0103[6][a]; emphasis supplied). Section 11-0103(1)(a) defines fish as "all varieties of the super-class Pisces". The general purpose of the Fish and Wildlife Law, "the efficient management of the fish and wildlife resources of the state" (§ 11-0303), is more expansive than solely promoting fish and game and the interests of fishermen and hunters. Section 11-0503 prohibits the polluting of streams. The orientation of section 11-0503 is not a narrow one dealing only with fish and game but rather is a far-reaching one which considers the effects of pollution on other wildlife and on the environment in general. There are other examples of the powers delegated to the Department under current law which demonstrate the broad focus of the Environmental Conservation Law to protect and advance the interests of all wildlife. For example:
 section 11-0325 authorizes the control of dangerous diseases;
 section 11-0511 prohibits the possession or transportation of wildlife except under permit;
 section 11-0515 authorizes the issuance of licenses for the possession of wildlife for propagation, scientific or exhibition purposes;
 sections 11-0521 and 11-0523 regulate the taking of destructive or menacing wildlife; and
 section 11-0525 authorizes the Department to control rabies in wildlife.
The Department has used conservation funds to improve fishing and hunting in the State. However, for some time the fund has also been used for a broader range of wildlife activities. For example, the restoration of hundreds of endangered species, such as the bald eagle and the perigrine falcon is one such program. These species are protected by the Fish and Wildlife Law:
 "Notwithstanding any other provision of this chapter, the taking, importation, transportation, possession or sale of any endangered or threatened species of fish, shellfish, crustacea or wildlife, or hides or other parts thereof, or the sale or possession with intent to sell any article made in whole or in part from the skin, hide or other parts of any endangered or threatened species of fish, shellfish, crustacea or wildlife is prohibited, except under license or permit from the department" (ECL, § 11-0535).
Additionally, for over ten years the Department has used conservation funds for the urban wildlife program which is designed to identify urban wildlife habitats and to preserve these habitats. The Department also has used conservation funds for the review of environmental impacts of various public works and development projects. The review is directed toward the impact on both game and non-game wildlife.
It is significant that the Department has conducted wildlife programs for many years because long continued courses of action by State administrative officers are entitled to great weight in the construction of statutes:
 "* * * [W]e recognize that where the interpretation of a statute or its application involves a special knowledge, courts regularly defer to administrative expertise." Mtr. of Burger King v Tax Comm., 51 N Y 2d 614, 621 (1980).
 "* * * [G]reat weight is always given to the interpretation of statutes by the authority who has to administer such statutes." Mtr. of Limousine Rental Service Inc. v Feinberg, 9 A.D.2d 986, 987 (3d Dept, 1959). See, also, Mtr. of Mounting and Finishing Co. v McGoldrick, 294 N.Y. 104, 108 (1945).
We have shown how, beginning in 1933 with the first reference in the conservation fund provision to Article 4 of the Conservation Law and continuing to the present date with the reference to Articles 11 and 13 of the Environmental Conservation Law, the focus of the Department's activities has broadened. Clearly, over the long history of the conservation fund, the permissible activities of the Department under Article 4 and later Articles 11 and 13 have related not only to fish and game and the interests of hunters, trappers and fishermen, but also to a wide range of wildlife programs. The Department has utilized these provisions in expending conservation funds for broad-based wildlife activities. We believe the Legislature took this history into consideration when it titled section 625 of the Tax Law, "Gift for fish and wildlife management", and authorized contributions to the conservation fund "for fish and wildlife purposes". It is clear under the Environmental Conservation Law and its predecessor, the Conservation Law, that this language contemplates a broad range of conservation programs and wildlife activities (see definition of wildlife, Environmental Conservation Law, § 11-0103[6][a]). Further, section 83 permits the use of conservation funds for all other proper expenses of the Department under Articles 11 and 13. This language does not restrict use to those provisions dealing with fish and game.
It can be argued that under section 83, the money must be spent for the defined "objects", which is the
 "* * * care, management, protection and enlargement of the fish, game and shellfish resources of the state and for the promotion of public fishing and shooting."
However, this language evolved from the earliest statute (L 1925, ch 592) when the focus was limited to fish and game. With the addition of the reference to Article 4 and later Articles 11 and 13 we believe the Legislature intended to expand permissible uses of the fund along with the broadening of the Department's mission. Otherwise, it would have been unnecessary to add this reference since the pre-existing statement of purpose would have been sufficient to authorize the expenditure of funds to implement any powers of the Department with respect to the care, management, protection and enlargement of the fish, game and shellfish resources of the State and to promote public fishing and shooting. It follows that with the addition of the reference, the Legislature intended to fund other wildlife management activities authorized by the Conservation Law and later the ECL. In authorizing a "gift for fish andwildlife" in section 625 of the Tax Law, it became very clear that the Legislature viewed section 83 as authorizing the use of the conservation fund for a broad range of wildlife activities.
In making a gift for wildlife, a taxpayer is acting under the authorization of section 625 of the Tax Law. Under the statute, this contribution is made for "fish and wildlife purposes". A conclusion that the conservation fund may be used only to promote the interests of hunters and fishermen would frustrate the interests of many taxpayers desiring to make a contribution for wildlife management as authorized by the clear statutory language of section 625.
The sources of funding for the conservation fund have broadened considerably. In 1925, the fund was composed of money received from the sale of licenses for hunting, trapping and fishing (L 1925, ch 592). Apparently, the purpose of the fund at that time was to promote fishing and hunting. However, beginning in 1933 (L 1933, ch 222), the sources of funding were expanded considerably. We believe that the expanding sources of funding is significant. It seems logical that the Legislature, in expanding the permissible uses of the conservation fund, would also similarly expand the sources of revenue. Thus, under current law, the source of funding is not limited to license fees paid by hunters, trappers and fishermen, but also is derived from other revenue of the Department relating to a diverse range of wildlife activities. This is further indication that the conservation fund may be used for a broad range of fish and wildlife activities.
We conclude that revenues from the "Gift to Wildlife" program may be used to support a broad range of fish and wildlife management activities.